## CONTEST OF WILL MADE WHILE TESTATRIX WAS IN EXTREMIS.

Common Pleas Court of Hamilton County.

FRANCES M. CRESS ET AL V. EDGAR STARK, EXECUTOR, ETC., WITH THE WILL ANNEXED OF MARY ANN BRITT, ET AL.

Decided, June 9, 1913.

*Wills—Charge of Court with Reference to Capacity of Testatrix to Make a Will—What is Implied by the Signature of a Witness to a Will— Validity of Will Executed While Testatrix Was in Extremis—Defini- tion of Prima Facie Evidence—Special Charge Asked During Argu- ment—Restraint—Weight of Evidence.*

1. It is not the province of a court, in its charge to the jury, to marshal witnesses into classes graded by their credibility. *State v. Tuttle*, 67 O. S., 440; *Sharp v. State*, 16 O. S., 218.
2. It is not proper for a court in its charge to select one single fact to the exclusion of others and comment on it. *Morgan v. State*, 44 O. S., 377.
3. No special charge, as such, may be given to the jury except before argument. Sec. 11447-5 General Code; *Village of Monroeville v. Root*, 54 O. S., 523.
4. It is error, in connection with the mentality of a testator, to tell a jury it may find whether the attorney, who prepared a will, carried out the instructions of the testator.
5. A jury is not chiefly interested whether a testator has the mentality to initiate a will and afterwards to remember the items of a will drawn by another under his instructions. Its chief concern is— was the testator of sound mind and memory at the time of the execution of the will. A testator's mentality before and after that period is important only as bearing on that period.
6. In the contest of a will, as in other actions, it is the duty of the court in its charge to cover all the main issues, whether raised di- rectly or by legitimate inference from the facts in the case.
7. The verdict of a jury will not be set aside on account of the weight of the evidence unless it is unsupported by or is against the de- cided weight of the evidence. *French v. Millard*, 2 O. S., 44 at 53.

*Horstman & Horstman* and *W. S. Walker*, for the plaintiffs.
*Stephens, Lincoln & Stephens* and *Rufus B. Smith*, contra.

DICKSON, J.

Mary Ann Britt died childless in Hamilton county, Ohio, seized of a large estate, chiefly realty and chiefly inherited from her husband, who died childless and intestate. Mrs. Britt thus became the owner of her husband's estate with a right to consume, or to give and bequeath, or to die intestate and thus intestate permit, under the statutes of Descent and Distribution, that estate, which came to her from her husband, to pass and descend, one-half to her brothers and sisters and one-half to her husband's brothers and sisters.

Shortly before her death, on her death-bed, Mrs. Britt left this will:

"In the Name of God, Amen.

"I, Mary Ann Britt, being of sound mind do make and publish this as my last will.

"Item First. I direct my executor and trustee hereinafter named to set apart and keep suitably invested sufficient of my estate to produce a net yearly income of forty-eight hundred dollars and from said income pay monthly during life the sum of one hundred dollars to each of the following persons, to-wit, my brother, Francis I. Partridge, my niece Mrs. McEwen, my niece Mrs. Dixon and my niece Blanche Partridge.

"Item Second. I direct my said executor and trustee to set apart and keep suitably invested a sum sufficient to yield a net income of one hundred dollars per month and pay the same monthly to my nephew Arthur J. Partridge son of said brother until he arrives at the age of twenty-five years and then to pay to him the principal sum so invested.

"Item Third. I direct my said executor and trustee promptly after my death to pay the sum of one hundred dollars to each of five priests in the diocese of Cincinnati, to be named by the Most Rev. Archbishop, with the obligation of saying masses for the repose of my soul. Also to pay promptly the following charitable bequests to the St. Joseph's Orphan Asylum now at Cumminsville the sum of five hundred dollars; to the Sisters of Charity for Seton Hospital the sum of five hundred dollars; to the Sisters of the Good Shepherd for the institution now conducted by them on Price Hill the sum of one hundred dollars.

"Item Fourth. I give to my sister Mrs. Margaret Orr the full one third of my estate.

"Item Fifth. All the rest and residue of my estate I give as follows one fourth thereof to my nephew Arthur J. Partridge,

one fourth to my niece Mrs. McEwen, one fourth to my niece Mrs. Dixon and one fourth to my niece Blanche Partridge. Said rest and residue shall be divided upon the death of my brother Francis I. Partridge. Thereupon the provision of one hundred dollars a month to my nephew and nieces shall cease.

"Item Fifth. Should any of my legatees contest this my will his or her portion shall become part of the residue of my estate.

"Item Sixth. I nominate and appoint Edgar Stark or whoever may be the trust officer of the Union Savings Bank & Trust Co. of this city executor and trustee of this my will. I give him full power to sell, lease, divide or rent any of my real or personal property and execute proper instruments for that purpose, to make repairs or improvements, to make and change investments and generally to do such things as may be necessary or proper in the administration of my estate and the trusts reposed in him without applying to court for leave so to do. I direct that in case any of my bequests or devises should be subject to any inheritance or other tax, the same be paid by my estate. I hereby vest in my said executor or trustee such title as may be necessary to carry out the provisions of this my will.

her<br>"Mary  Ann  X  Britt.<br>mark

"Cincinnati, June 27, 1910.

"Signed and acknowledged as and for her last will by the said Mary Ann Britt in our presence and we have at her request and in her presence and in the presence of each other signed the same as attesting witnesses.

"Roy W. Kinsey, M. D.<br>"J. Stewart Hagen, M. D.<br>"John Ledyard Lincoln."

This will was probated in Hamilton county, Ohio, is here in contest. There has been a verdict against the will, and this court is now asked by the defendants to set aside the verdict of the jury for the reasons hereinafter stated.

The court's general charge was as follows:

"Gentlemen of the Jury: Under the laws of Ohio, a person of full age, of sound mind and memory and not under restraint, who has property or any interest therein, may give and bequeath it by last will and testament lawfully executed. Except nuncupative, every last will and testament must be in writing, but may be hand written or typewritten. Such will must be signed at the end by the party making it, or by some other per-

son in his presence and by his express direction, and must be attested and subscribed in the presence of such party by two or more competent witnesses who saw the testator subscribe or heard him acknowledge it.

"The signature may be by a mark. A will to be operative must be probated, that is, it must be produced before the probate court and the probate court shall cause witnesses to the will, and such other witnesses as any person interested in having it admitted to probate desire, to come before the court. Such witnesses shall be examined in open court and their testimony reduced to writing and filed.

"If it appear that such will was duly attested and executed and that the testator at the time of executing it, was of full age and of sound mind and memory and not under restraint, the court shall admit the will to probate.

"A will can not be contested in the probate court, but it may be rejected by the probate court.

"A person interested in a will admitted to probate in the probate court may contest its validity in a civil action in the court of common pleas in the county in which such probate was had.

"The issue to be decided by you is not made by the pleadings but by order of court, and is by consent as follows:

"Now come the parties hereto and it appearing to the court that the plaintiffs in this case seek to set aside a certain paper writing purporting to be the last will and testament of Mary Ann Britt, late of the county of Hamilton, which has been duly admitted to probate, and no issue being made up by the pleadings as to certain parties herein, it is now ordered that the validity of said will be and it hereby is put in issue between the parties and that it be ascertained by the verdict of the jury whether said writing is the last will and testament of said Mary Ann Britt or not.

"After this action was filed, the probate court, on due notice, presented to this court the will, testimony and all papers relating thereto, with a copy of the order of probate, attaching them together and certifying them under seal of the court. These papers are now before you.

"The order of probate is *prima facie* evidence of the due attestation, execution and validity of the will. By *prima facie* we mean if you find that these matters certified to by the probate court probably occurred they will prevail, unless the contrary be found by you by all the evidence in the case now being tried. After the papers from the probate court were offered in evidence and read to you the plaintiffs rested.

"Again, the issue is, Is the writing purporting to be a will offered in evidence, the last will and testament of Mary Ann Britt? If no evidence had been offered other than the certified papers from the probate court your duty would have been to have found against the plaintiffs. But evidence has been offered by the plaintiffs and heard by you to the end that you may find for the plaintiffs. The burden of proof is upon the plaintiffs to enable you to find by all the evidence that this paper writing is not the last will and testament of Mary Ann Britt. The plaintiffs by this burden must overcome not only the order of probate, but also by this same burden you must find that the paper writing in question is not the last will and testament of Mary Ann Britt.

"By the burden of proof we mean by the preponderence of the evidence.

"By preponderance of the evidence we mean by the greater weight of the evidence. The evidence favorable to the plaintiffs must not only outweight the evidence favorable to the defendants, but also the presumption arising from the order of the probate court.

"Was Mary Ann Britt of sound mind and memory, that is, was she in that mental condition which made her capable of knowing and remembering her property, of knowing and remembering the persons who were or whom she desired to be the subjects of her bounty or generosity when she made the alleged will? There is no duty in a testatrix to give anything to anyone.

"Was Mary Ann Britt under any restraint, that is, wrongful influence—wrong restraint, or urgency or persuasion, by which her will was overcome and she was induced to do, or forbear to do, an act which she would not have done, or would have done, if left to act freely? Was she at the time she signed this paper a free agent doing as she pleased—making her will?

"Wrongful influence to invalidate her will must appear to have had some effect on the very act of making the will by imposing a restraint upon her independent wishes and judgment as to the disposition of her property.

"To weigh evidence—measure evidence with evidence—place all the evidence favorable to the plaintiffs on one side of the scales, and place all the evidence favorable to the defendants on the other side of the scales and see if the scales thus weighted balance. If they do not there is no preponderance and the plaintiffs fail. If the plaintiffs would prevail their side of the scales must over balance the other side. To ascertain the greater weight, you must consider the credibility of the evidence, the

testimony.    Credibility means worthy of belief.    Ask yourselves
as to each witness, did he or she tell the truth?    When you thus
ask you will consider what was said—knowledge; who said it—
motive; how it was said—manner.    You will consider any in-
terest or bias each witness may have had in the case, the parties,
the attorneys, the result, which would tend to affect his or her
accuracy or truthfulness.    Apply similar tests to the exhibits.

"You will not be controlled by the number of the witnesses.
You will consider the number as any other item of evidence and
give it its due weight.    You have heard the testimony of ex-
perts.    The law permits one learned in a science not in the com-
mon knowledge of all to give his opinion to aid you.    You are
not bound by this opinion given.    You will consider it as an
item of evidence and give it its due weight as to its credibility
and to the tests of an ordinary witness add the knowledge and
learning of the expert in his science."

Did the court err in its definition of *prima facie?*

The court said "The order of probate is *prima facie* evidence
of the due attestation, execution and validity of the will.    This
is in accord with Section 12083 of the General Code.    Next, the
court said:

"By *prima facie,* we mean, if you find these matters, certified to
by the probate court probably occurred they will prevail, unless
the contrary be found by you by all the evidence in the case now
being tried."

The matters certified to were "attestation, execution and
validity" of the will by the probate court.    The certificate makes
a *prima facie* case—probable case—presumptive case—not a
conclusive case.    If the "matters certified" were conclusive the
will would be valid and there could be no contest.    A *prima facie*
case raises a presumption, which is nothing more than a sup-
position, grounded or founded on probable evidence entitling it
to belief.    A verdict of a jury does not depend upon conclusive
proof.    Its validity is established on a belief, a supposition, a
mere first view, *prima facie,* probability, an if, a presumption.
The court, on this subject, charged again:

"If no evidence had been offered other than the certified
papers from the probate court your duty would have been to have
found against the plaintiffs."

The court, on this subject, again charged:

"The evidence favorable to the plaintiffs must not only out-weigh the evidence favorable to the defendants, but also the pre-sumption arising from the order of the probate court."

Again, on this subject, the "matters certified," the court gave defendants' special charge:

"The order of the probate court admitting the will of Mary Ann Britt to probate raises a presumption that the will, so pro-bated, is the valid last will and testament of Mary Ann Britt, and before you would be entitled to return a verdict setting aside her will you must find that the evidence against the will out-weighs both the evidence in its favor and the presumption arising from the order of the probate court in admitting the will to probate as the valid last will and testament of Mary Ann Britt."

And again, on this subject, the "matters certified," the court charged:

"The burden of proof is upon the plaintiffs to enable you to find by all the evidence that this paper writing is not the last will and testament of Mary Ann Britt.  The plaintiffs by this burden must overcome not only the order of probate but also by this same burden you must find that this paper writing in ques-tion is not the last will and testament of Mary Ann Britt."

As to these "matters certified," the court's charge and this special charge could not have been more favorable to the defend-ants unless it had directed a verdict for them.

The issue was, is the will offered Mrs. Britt's will?  The certifi-cate from the probate court raises such a degree of probability that it must prevail if it be credited by the jury and will prevail unless it is rebutted.  Conclusive evidence would exclude the possibility of there being a mistake.  There is no good reason why the facts certified to could not have been contradicted in this action.  If not contradicted, the jury would have been war-ranted in finding the "matters certified" did occur.  A finding of a jury is not necessarily the truth, because a jury need not be convinced, or satisfied, or believe.  It simply finds—does the best it can with the utter unreliability of all human testimony.

But even if the use of the words "probably occurred" were erroneous, a new trial will not be granted for such an error in the charge if it appear from the charges, general and special, either or both, that the jury was not misled.

"In order to determine whether a single proposition in the charge of the court to the jury is erroneous or misleading, the whole charge, so far as the same bears upon the matter involved, will be considered." *Railway* v. *Shannon,* 4 O. C. C., 449.

Did the court modify or explain a certain special charge?

The court gave this special charge requested by the defense:

"The order of the probate court admitting the will of Mary Ann Britt to probate raises a presumption that the will so probated is the valid last will and testament of Mary Ann Britt, and before you would be entitled to return a verdict setting aside her will you must find that the evidence against the will outweighs both the evidence in its favor and the presumption arising from the order of the probate court admitting the will to probate as the valid last will and testament of Mary Ann Britt."

During argument counsel on each side discussed the meaning of this charge and an appeal was made to the court. The court then, to avoid even a suspicion of modifying or explaining that charge, read to the jury and with the consent of counsel on both sides, what it would charge on the subject in its general charge, and then, thereafter, immediately again read the above special charge, in all of which there was no error and to all of which there was no exception taken.

Did the court err in its refusal to give two certain special charges asked by the defense as to the testimony of two of the subscribing witnesses to the will?

The defense claims the court erred in refusing to give these two certain special charges:

(a) "The court instructs the jury that where a person signs his name as a witness to a will and afterwards testifies in the probate of the will that the testatrix was of sound and disposing mind and memory and subsequently, in a contest of the will, seeks by his testimony to impeach the validity of the will

on the ground that the testatrix was not of sound and disposing mind and memory, such testimony ought to be viewed with suspicion.''

(b) ''A person who attaches his name as a witness to a testamentary instrument impliedly certifies that the testator is of sound mind and competent to make a will; and while the law will subsequently permit him to testify to the contrary because the truth, if such it be, should be learned, yet the jury trying the case may consider the fact of such implied contradiction in weighing his testimony.''

The court is of the opinion that while a jury may view such conduct with suspicion and may disregard such testimony, yet it would be gross error for the court to single out any witness or witnesses and tell the jury to accept his or their testimony with caution and view it with suspicion. Such a charge would be quite as erroneous as if the court were to tell the jury that:

''The will of a dying person, made very close to the point of death, requires a careful scrutiny of the surrounding circumstances which bear upon the capacity of free volition.''

This is from *Schouler on Wills*, 3d Ed., Section 73, and is part of a citation made by the defense on another subject. That a death-bed will requires careful scrutiny is good law, yet the defense will scarcely admit the court should say so to the jury directly or indirectly. The jury is the sole judge of the credibility of the testimony. The court is not an expert on the credibility of any witness, or any testimony, or any evidence, and has no right to give its opinion thereon to the jury. The court in this case did its whole duty when it said:

''To ascertain the greater weight you must consider the credibility of the evidence, the testimony. Credibility means worthy of belief. Ask yourselves as to each witness, did he or she tell the truth? When you thus ask you will consider what was said—knowledge; who said it—motive; how it was said—manner. You will consider any interest or bias each witness may have had in the case—the parties, the attorneys, the result—which would tend to affect his or her accuracy or truthfulness.''

''It is not the province of the court to classify the witnesses. * * * Their credibility should be left to the jury under all

the competent facts and circumstances before it.'' *State* v. *Tuttle*, 67 O. S., 440, *Sharp* v. *State*, 16 O. S., 218.

It would have been error to have stated to the jury there was an ''implied contradiction'' in a witness's testimony.

''Where one single fact is selected and strongly commented on the tendency is to distort its importance in the estimation of the jury, and to concentrate attention too intently upon it, to the undervaluing of the rest of the evidence.'' *Morgan* v. *State*, 44 O. S. 377.

The court refused to give a certain special charge asked by the defense during argument.

During the argument of counsel for the plaintiff this charge, as a special charge, was handed to the court and was refused as a special charge because requested at that time:

''It is not essential to the validity of the will that all or any of the subscribing witnesses should testify that the testatrix was of sound mind and memory provided you find from all the evidence before you that she was of sound mind and memory.''

''When the evidence is concluded either party may present written instructions to the court on matters of law and request them to be given to the jury, which instructions shall be given or refused by the court before the argument to the jury is commenced.'' Section 5190-5, Revised Statutes; Section 11447-5, General Code; *Village of Monroeville* v. *Root*, 54 O. S., 523.

After its refusal at that time the charge was evidently forgotten. This charge was not shown to opposite counsel or again presented to the court. It was not requested to be incorporated in the general charge. The court at the conclusion of the general charge was not requested to give it or its substance. The court at the conclusion of its charge or at no time was told that he had not covered it in the general charge.

The court is of the opinion that such conduct of the defense was either a submission without exception to the order of the court or a voluntary withdrawal of the charge, and that the charge should not have been given as requested because it was not submitted to opposite counsel.

One of the purposes of special charges is that there may be harmony before the jury between all counsel and the court, on vital law points, covering the issues.  Such a charge seen only by one side tends to confusion and is manifestly unfair to the other side, and tends to prevent a losing side from feeling that justice has been done.

The court is also of the opinion that the matters in this special charge are covered by the general charge when it said:

''Was Mary Ann Britt of sound mind and memory  *  *  * when she made the alleged will?  Also was Mary Ann Britt under any restraint?  *  *  *  Was she at the time she signed this paper a free agent doing as she pleased—making her will?''

Again, the jury were told in the general charge to weigh all the evidence.  Thus that special charge should have been refused even if submitted to the other side and requested after the general charge, and also because it would have been classifying these witnesses—witnesses to the will—which classification is prohibited, *supra.*

The court refused to give a certain special charge asked by the defense in reference to the ability of a testator *in extremis* to execute a will previously initiated.

The court was asked by the defense to give this special charge before argument:

''If prior to the execution of the will you find that Mrs. Britt had sufficient mental capacity to understand the nature and extent of her property, to realize the relation which she held to those who had claims against her and to make a selection among them; and that while having such mental capacity she gave instructions to her attorney as to what disposition she wished to make of her property by will.

''And if you further find that her instructions were carried out by her attorney, and that while having the mental capacity before stated the will was read over to her and she assented to it.

''And if you further find that when she signed said will she knew she was signing the will previously drawn by her attorney in obedience to her instructions and she knew it had been drawn according to her instructions and approved by her and

intended by her signature to give assent to such instrument as her will, knowing its contents, then I charge you that if such instrument is properly executed and witnessed it would be her valid last will and testament.''

Counsel, in support of this charge, cite *Parker* v. *Tellgate*, L. R., 8 Probate Div., 171:

''If a testatrix has given instructions for her will, and it is prepared in accordance with them, the will will be probated though at the time of execution the testatrix merely recollects that she has given these instructions, but believes that the will, which she is executing, is in accordance with them.''

To the same effect, counsel for the defense cite *Perera* v. *Perera*, 1901 Appeal Cases, 354, at 361:

''If a person has given instructions to a solicitor to make a will and the solicitor prepares it in accordance with these instructions, all that is necessary to make it a good will, if executed by the testator, is that he should be able to think thus far, 'I gave my solicitor instructions to prepare a will making certain dispositions of my property. I have no doubt that he has given effect to my intention and accept the document which is put before me as carrying it out.' ''

To the same effect, *Bennell* v. *Duke*, 2 Weekly Rep., 644.

This is not the law of Ohio. The time to test testamentary capacity is that of the execution of the will. The time before and after is important only as bearing on that period.

''The power to make a will is granted by the statute to 'any person of full age and sound memory,' and under its provisions the will is admitted to record as valid when 'duly attested and executed, and the testator, at the time of executing the same, was of full age and sound mind and memory and not under any restraint.' '' *Monroe* v. *Barclay*, 17 O. S., 302, 315.

Counsel for the defense also cite on this point:
*Hawthorne et al* v. *King, Exr.*, 8 Mass., 371; *McMasters* v. *Blair*, 29 Pa. St., 298; *Masseth* v. *Masseth*, 213 Pa. St., 437; *In re Wilde's Will*, 77 N. Y. Supl., 164; *In re McGraw's Will*, Vol. 9, App. Div. (N. Y.), 372; *O'Brien* v. *Dwyer*, 45 N. J. Eq., 689,

at 696; *Clifton* v. *Clifton,* 47 N. J. Eq., 227; *Schouler on Wills,* 3d Ed., Section 73.

In none of these American citations is it asserted that a solicitor or any one may be authorized to make a will for another. In the special charge in question this court was directly asked to tell the jury:

"And if you further find that her instructions were carried out by her attorney."

The court is of the opinion that the jury had nothing to do with the honesty, or intelligence, or accuracy of the attorney.

It is not proper to tell a jury it may speculate or meta-physically scissor as to degrees of capacity or mentality in the process of will-making. The closer the court in its charge adheres to the words of the statute, "sound mind and memory at the time of the execution of the will," the better. A jury, as such, is not interested, as an end, whether a testator has or has not the mentality to initiate or to follow. Its concern is with soundness of mind and memory at the time of the execution of the will.

Did the court err in its general charge by making reference to restraint?

Did the court err in referring to undue restraint in the general charge? During the trial one of counsel for the defense asked one of the counsel for the plaintiffs if he claimed undue influence or restraint. The answer was that he claimed any legitimate inference the facts tended to support.

The issue raised by the court in its charge was "Whether said writing is the last will and testament of said Mary Ann Britt or not." That is, was she at the time of executing the will of full age and of sound mind and memory and not under restraint?

"No precise quantity of influence can be said to be necessary and sufficient in all cases, as the amount necessarily varies with the circumstances of each case, and especially does it vary accordingly as the strength or weakness of mind of each testator varies, the amount of influence necessary to dominate a mind

impaired by age, disease, or dissipation, being obviously less than that required to control a strong mind." *40 Cyc.*, 1144-1146.

"A spiritual adviser is ordinarily in the relation of peculiar confidence toward his congregation or parishioners. Accordingly, as in other cases of those in confidential relations, undue influence may be inferred as a presumption of fact from the additional circumstance that such adviser drew the will or procured it to be drawn. And suggestions from a spiritual adviser may amount to undue influence when similar suggestions from a stranger would not." *Page on Wills*, Section 419.

"It is undoubtedly well settled that to invalidate a will for fraud or undue influence it must appear that the fraud or undue influence has some effect upon the testator in producing the very act of making his will." *Monroe* v. *Barclay*, 17 O. S., 302, 313.

Mrs. Britt died many years after her husband. There is no evidence that she ever attempted to make a will before this will. The passing of the bulk of this estate peculiarly depended upon the making of a will. The will was made the day she died —shortly before she died. The testimony is undisputed that if left to herself she would not have made a will that day and that she would have died intestate. She resisted and postponed all will matters effectively until finally talked to by Sister Electa. Why she had made no will, and why she resisted until near the end, and at the end, will never be known. But she did, and the court would have prejudiciously erred if it had refused a proper special charge on restraint; and would have been negligent in its duty if it had not charged specifically upon restraint, as one of the essential elements in this case, without any request. Restraint was both in the case directly and by legitimate inference from the evidence.

Mr. Lincoln, attorney for Mrs. Britt at the making of the will, and one of the witnesses to it, testified:

"And I said, now, Mrs. Britt, will you execute it now? And she said, come back in the morning, and I said to her, I think, Mrs. Britt, you better execute it now; and she said, no, come

back in the morning.   Then I went out.   I didn't press the matter any further, but went into the hall and found Mrs. Orr (sister of Mrs. Britt) and Sister Electa and I said, she wants me to come back in the morning to execute it, and we discussed the matter, and I said I thought it was a pity she wouldn't execute it now; and Sister Electa said, I will go in and talk to her; and she went in and within a few moments afterwards she came out and said, she will execute it now.   I was not in the room with Sister Electa."

Dr. Domhoff, the attending physician, testified:

"Well, I met Father Moore on the sidewalk in front of the hospital as I was leaving the hospital and he asked me of course how Mrs. Britt was and I told him in as few words as I could that she was in a moribund condition and about to die, and he was very much surprised on hearing this news and he told me that he wished me to go back into the hospital to tell her this fact that she was seriously ill and probably would not recover, which, up to this time, had not been told her.   I tried to get out of that because it was not a very pleasant mission for me to do, but Father Moore insisted and thought that I, as the medical attendant, should go back and tell her that she was so seriously ill she might not recover, and that if she had any temporal affairs to look after or any other business she wanted to attend to, now was the time to do it.   So I went back with Father Moore and told her in as gentle a way as I could that she was seriously ill, and while there was life there was hope, but still she was so very ill I couldn't look very far into the future and that we hoped for her recovery; still she had better look after her temporal affairs, if she had any to look after, to be on the safe side.   And after I said that I left.

"Q.   Was Father Moore with you when you said it?   A. Yes, sir.

"Q.   Did he leave with you or go out with you?   A. Yes, sir.   He left with me.

"Q.   Do you know whether he went then and telephoned to any lawyer to come down?   A. Yes, he went immediately to the telephone and we were walking along the corridor and he seemed to be thinking aloud and he said, let me see, I believe I will call either Mr. Dempsey or Mr. Lincoln to look after her; and he finally says, I will call Mr. Lincoln.   He is the Archbishop's attorney.   And he immediately went to the phone to telephone."

The Rev. James M. Moore testified:

"I helped Dr. Domhoff in this matter by telling her that the doctor evidently considered her in a very serious way and that, though she might rally, and we hoped she would be in Atlantic City this summer as she desired to be, still it was better for her to take seriously this urgent request of my own and the doctor's and attend to her temporal affairs. As far as I can recollect she immediately said, If the doctor thinks I am so sick I shall do as you request; ask Mr. Lincoln to come immediately to see me. That is as far as I can recollect."

Is the verdict against the evidence?

The evidence, as to restraint, will be considered as repeated here.

Was there enough evidence as to want of soundness of mind and memory to sustain the verdict?

Dr. Domhoff, the attending physician, testified:

"Q. Doctor, when you called in the morning (of the day Mrs. Britt died and the day she made the will), she was in a moribund condition? A. Yes, sir.

"Q. That is, she was dying? A. If you mean dying, moribund are synonyms, yes.

"Q. When did she get in a moribund condition? A. I don't know. She was in a moribund condition in the morning when I arrived at the hospital.

"Q. Had she been in a moribund condition the day before? A. No, sir.

"Q. What was the change in her that leads you to say she was moribund that morning? A. The symptoms you mean?

"Q. Yes. A. Why the symptoms of a moribund condition are those of failing circulation, heart's action; in other words, superficial, feeble, rapid respiration, breathing.

"Q. What about the appearance of the face and eyes? A. The appearance of the face and eyes is one like in sleep. *    *
*    *

"A. She took liquid diet strictly.    *    *    *

"Q. How was her physique affected by the disease? Did she become emaciated? A. Yes, sir.

"Q. Are toxins absorbed by the blood from such a growth? (Cancer of the intestines.) A. Yes, sir.

"Q. What is it that finally causes death in a case of that kind; the direct cause? A. The direct cause is the stopping of the heart and respiration. Is that what you mean?

"Q. Didn't you answer that before, exhaustion? A. Exhaustion is the term we use when there is mal-nutrition going on, an asthemia. They are synonyms and mean the patient is giving out, just wearing out. It is hard to draw a distinction between the two.

"Q. And the organs of the brain wear out? A. Yes, sir.

"Q. Didn't you answer this way, 'The last visit was an abbreviated one because others were waiting to get into the room and we hurried out'? A. That is right.

"Q. Didn't I ask in conclusion this question 'Do you think at that time she was in a condition mentally to transact important business'? A. I could not say. That is right, I could not say.

"Q. You can't say now? A. I don't think I could. No, sir."

Dr. George A. Fackler, consulting physician, testified, as to her condition at about 4:30 P. M. (the will was signed about 6:45 P. M.) :

"As I remember it, she lay there with a rather pallid face with her eyes closed and with the expression of lassitude, as you see in all these cases, and from which she was aroused by inquires as to her feeling and possibly other few questions I asked within the five minutes.    *    *    *

"A. She could, as one in her condition would be influenced by some one of determination and will power who has probably had previous influence upon her, some one for whom she had a special regard, whose advice she depended upon during that period, might influence her more strongly or more readily than at another time."

Sister Electa testified that she shortly after Mrs. Britt's death said :

"I don't remember whether she, Mrs. Britt, held the pen or not. I know I helped her but how I did it I don't remember. I don't know whether she could recognize the different persons or not. We could safely say she was dying all day. She was certainly in a dying condition when she signed the will. I don't know that she spoke at all after the will was made. I don't think she did at all."

Dr. Roy W. Kinsey, a witness to the will, an interne at the hospital, testified :

"Q.   What was her condition as you came in?   A. She was lying perfectly quiet with her eyes closed.

"Q.   Who first spoke to her?   A. I believe it was Mr. Lincoln.

"Q.   What did he say?   A. He told her that we were there as witnesses to her will.

"Q.   What caused her to open her eyes if she did open them? A. Sister Electa attempted to arouse her by taking hold of her and again explaining the purpose.

"Q.   Had she responded to Mr. Lincoln's request to her, above referred to?   A. No.

"A.   She didn't respond at all to being talked to until after Sister Electa took hold of her and aroused her.   A. She was just lying in stupor.

"Q.   Did she get out of that stupor?   A. Only partially.

"Q.   How many times was she asked to sign by either Mr. Lincoln or Sister Electa?   A. Two or three times I should say.

"A.   They (her eyes) were closed until after she was aroused, then they remained open.

"Q.   When Mr. Lincoln or Sister Electa asked her to sign the will as before stated by you, did they attempt to hand her a pen for signing?   A. Yes, the last time she was asked Sister Electa tried to hand her a pen and placed it in her hand.

"Q.   What did Mrs. Britt then do?   A. She didn't do anything, the pen just laid in her hand.

"Q.   Who made the cross?   A. She had her hand on the pen holder when Sister Electa made the cross.

"Q   Did Mrs. Britt recognize you while you were in the room?   A. No, sir.

"A.   She was in a stupor when we entered the room and was never entirely aroused out of it.

"A.   I don't believe she was conscious of what she was doing.

"A.   Well she didn't act as though she was interested in what she was doing and her appearance was that of a very low woman.

"Q.   Was the will or any part of it read to her while you were present?   A. No, sir.

"Q.   Was any statement or explanation concerning any parts of the contents of the will made while you were present?   A. No, sir.   *   *   *

"Q.   What was the occasion or cause of your being in the room as long as fifteen or twenty minutes?   A. As I stated it took several minutes to arouse her from the stupor, then she didn't make her mark immediately after she was aroused.

"Q.   What in your opinion was the mental condition of Mrs.

Britt while you were there that afternoon? A. I don't believe she was conscious of her surroundings."·

Dr. J. Stewart Hagen, a witiness to the will, an interne at the hospital, testified:

"It was with a great deal of effort that Mrs. Britt was made to understand what was wanted of her. It was necessary to arouse her, and as I say it took a good deal of effort to make her understand. Finally she gave some evidence of understanding, that something was wanted of her, and her voice being very weak, Dr. Kinsey and myself were standing beside the bed close; I was unable to understand because her voice was very indistinct.

"As I remember it, I was in the room some twenty, possibly, approximately twenty minutes.

"Q. What was the occasion of your being there so long? A. The difficulty in arousing her, the difficulty in making her understand. what was wanted of her.

"A. Her eyes were closed. A. She would open them and close them very readily.

"Q. Were you introduced to her? A. No.

"Q. Do you think she comprehended who you were and what you were there for? A. I do not.

"Q. Did she ask you to sign the will as a witness? A. No.

"A. Her mentality was very poor. She was lifted up and assisted into a semi-reclining position, pillows being placed at her back.

"Q. How long before the mark was made to her will was she in that position? A. Probably ten minutes.

"Q. Immediately upon Sister Electa. touching her on the shoulder or arm, her eyes would open momentarily, and then close again. A. Finally a mark was made while Mrs. Britt's hand touched the tip of the pen. A cross was made.

"Q. Who held the pen? A. Sister Electa.

"Q. Who made the cross? A. Sister Electa.

"Q. Who placed the hand of Mrs. Britt upon the pen? A. I think Sister Electa did that, I wouldn't say positively, but I knew a hand was placed upon the pen.

"Q. As she was lowered down were her eyes open or closed? A. Closed as I remember.

"Q. Did she say anything at all after that? A. No. She remained perfectly quiet.

"Q. Was she able to see you? A. No, I don't think so. *
* *

"Q. What did you swear to that for? (Showing witness his probate court affidavit.)

"A. That is my signature, but it is my opinion she was not of sound mind and memory.

"Q. Then why did you tell Judge Lueders so? A. I am telling it now, that was my opinion.

"Q. Why didn't you tell Judge Lueders so? A. I don't know why I didn't.

"Q. In other words, you were signing and swearing to a statement that was false; is that so? A. When I signed that statement, I say that in my opinion that is not true, it is not my opinion she was of sound mind; in other words, I signed that statement not knowing the full import of it.

"Q. Didn't Judge Lueders ask the question of you? A. I wouldn't say he did.

"Q. Did he or not? A. I can't say as to that."

Gertrude Gerwe, one of the nurses, testified:

"She was getting weaker, but her condition on the last day was very marked.

"Q. And she knew things around her? A. Well, I don't know that.

"Q. Was she able to rise up in bed that day? A. No. She was very weak. She wasn't able to barely move.

"Q. Was not able to extend her hand and hold anything? A. No, I think not."

Alpha Rupp, another of the nurses, testified:

"(On the night before Mrs. Britt died) She didn't seem as strong and able to get up as she had the nights before. She didn't care for nourishment like she did the night before and she vomited (the contents of her bowels) so often it was weakening her all the time.

"Q. And the last night she seemed dazed? A. She did.

"Q. In what way did she indicate that? A. Well, she didn't seem prompt to take hold of things and when I would ask her something she didn't seem to hear right away."

The above evidence and more of the same kind was heard by the jury, and there was testimony tending to contradict some of it. The jury had a right to believe that testimony. If they did they could not have found a different verdict. No evidence was

offered that these witnesses had any interest in the case in any way.

The court can not say that the verdict is unsupported by or is against the decided weight of the evidence.

"The verdict of a jury should not be set aside by the court to which it is returned on account of any mere difference of opinion between the judge and the jury as to the weight of the testimony, but only when the verdict is unsupported by or is against the decided weight of the evidence." *Dean* v. *King*, 22 O. S., 134.

"A mere difference of opinion between the court and the jury does not warrant the former in setting aside the finding of the latter. That would be in effect to abolish the institution of juries and substitute the court to try all questions of fact. It must be clear that the jury has erred, before a new trial will be granted on the ground that the verdict is against the weight of the evidence. In this instance, although we can not say that our judgments approve the verdict, yet, on the other hand, we are unable to say that it is clearly wrong." *French* v. *Millard*, 2 O. S., 44, at 53, Thurman, J.

The motion for a new trial will be overruled and judgment entered on the verdict.